*nLayer Communications*
*Master Products and Services Agreement*

## MASTER PRODUCTS AND SERVICES AGREEMENT

_Revelation Networks_ ("Customer"),

a _S CORP_ (entity type) in the State of _Florida_.

These General Terms and Conditions together with all Order Form(s), Supplements and other addenda and service-specific terms and conditions attached hereto from time to time constitute the Master Products and Services Agreement ("Agreement") which is effective

as of _04/13/2010_ ("Effective Date") (the date of execution by both parties below) by and between nLayer Communications, Inc. ("NCI" or "nLayer"), an Illinois corporation, and Customer. NCI and Customer are collectively referred to as the "Parties" or individually as a "Party".

### 1. DEFINITIONS
- "*Acceptable Use Policy*" – NCI's guidelines for acceptable uses of NCI's service, set forth on the NCI Website and updated from time to time.
- "*Anti-SPAM Policy*" – NCI's policy on SPAM generated thru the use of NCI's Products or Services, set forth on the NCI Website and updated from time to time.
- "*Commencement Date*" - the date upon which NCI provisions an ordered Product or Service as more fully described in the relevant Order Form.
- "*Customer Location*" - a location designated in an Order Form for connection to the NCI Network, if outside a Datacenter Facility.
- "*Datacenter Facility*" – A location where NCI maintains a presence for the physical housing of computer and/or network equipment.
- "*Online/Phone Order*" – any order for Products or Services placed by telephone or email to NCI which requires only verbal/written consent, and accepted by NCI. These orders are limited in scope to on-demand remote hands services and spare parts provided by NCI to Customer at Customer's request.
- "*Order Form*" - any mutually executed sales order ("Sales Order"), schedule ("Schedule"), or statement of work ("Statement of Work") to these General Terms and Conditions and respective service-specific terms and conditions, detailing the Products or Services, the Term, Customer charges, the estimated Commencement Date and any other relevant terms agreed upon by the Parties.
- "*Products or Services*" - the products or services provided by NCI (including, without limitation, co-location, bandwidth, managed services including remote hands, computer hardware, and hosting) to Customer.
- "*NCI Network*" - collectively, the fiber optic network, system capacity and related facilities (including, without limitation, routers, switches and communication channels) owned or controlled by NCI.
- "*NCI Website*" –NCI's company website, published at http://www.nlayer.net. "*Service Level Agreement*" – a set of terms and performance guarantees which apply to specific services provided by NCI to Customer, contained in a Supplement (defined below).
- "*Supplement*" – a set of terms and conditions specific to certain services provided by NCI which govern Customer's use of Products or Services.
- "*Term*" - the period of time in which NCI provides Products or Services to Customer pursuant to an Order Form.

### 2. STRUCTURE OF AGREEMENT
**2.1. Order Forms.** From time to time, the Parties will execute one or more Order Forms for NCI to provide Products or Services, each of which shall be governed by, and automatically incorporated by reference into, this Agreement and shall be subject to these General Terms and Conditions.
**2.2. Supplements.** NCI may provide Supplements which contain supplemental terms and conditions specific to certain services provided by NCI to Customer which include any Service Level Agreement applicable to the services described therein. Any Supplement, when executed by the Parties, shall be governed by, and automatically incorporated by reference into, this Agreement and shall be subject to these General Terms and Conditions.

### 3. INVOICING AND PAYMENT
**3.1.** If a non-recurring installation charge or setup fee ("Installation Charge") is specified in an Order Form, NCI will invoice Customer for and Customer will pay such Installation Charge upon the effective date of the Order Form ("Order Form Effective Date"). If the Installation Charge is "estimated", Customer shall pay an initial amount, as specified on such Order Form, on the Order Form Effective Date and the remaining balance of the "actual" Installation Charge upon the Commencement Date. The balance of the actual Installation Charge will be invoiced by NCI and paid by Customer within thirty (30) days of such invoice.
**3.2.** If a recurring charge ("Recurring Charge") (e.g. Monthly Charge, Quarterly Charge, Annual Charge, etc.) is specified in an Order Form, NCI will invoice Customer for and Customer will pay Recurring Charge in advance for each period and within thirty

Customer Initials: 

EXHIBIT C

**nLayer Communications**
**Master Products and Services Agreement**

(30) days from the date of such invoice. NCI will begin to invoice the Recurring Charge on the Commencement Date. Invoices for partial months will be pro-rated.

3.3. If a prepayment ("Prepayment") is specified in an Order Form, NCI will invoice Customer for and Customer will pay such Prepayment upon the Order Form Effective Date. If a Prepayment is for a portion of a Term, the amount of such Prepayment will be applied as a credit to the final Recurring Charges at the end of such Term.

3.4. If an operation and maintenance charge ("O&M Charge") is specified in an Order Form, NCI will invoice Customer for and Customer will pay such O&M Charge beginning on the Commencement Date in advance of each month during the Term and within thirty (30) days from the date of such invoice.

3.5. If applicable, NCI will invoice Customer and Customer will pay such invoices for any additional charges for Products or Services which are more fully described in the respective Order Form.

3.6. All invoices must be paid in accordance with their terms without setoff or deduction, and late payments will accrue interest on the unpaid sum as of the date of the invoice at the lesser of (i) the highest legal rate of interest permitted in the state of Illinois or (ii) one and one-half percent (1.5%) per month. NCI may apply any payments received by NCI to any one of Customer's then outstanding charges.

3.7. Unless otherwise specified, all payments must be made by Customer to NCI in United States of America dollars.

3.8. For Services ordered through Sales Orders, the initial rates and fees for such Services will be listed on the Sales Orders. In the event that Customer places an order for Services from NCI using a method acceptable to NCI other than a Sales Order, including the NCI Website or Support Ticketing System, the initial rates and fees for such Services will be NCI's then-current list price for such Services. The rates and fees for Services ordered by Customer on an Order Form or Online/Phone Order will remain in effect for one year from the date of the Order. Thereafter, rates and fees will be subject to change, at NCI's reasonable discretion, upon sixty (60) days' prior written notice. Notwithstanding the foregoing, there are no restrictions on NCI's right to modify its rates and fees for Services as to Orders not in effect prior to such changes.

3.9. If Customer wishes to dispute any charge billed to Customer by NCI (a "Disputed Amount"), Customer must submit a good faith claim regarding the Disputed Amount with documentation as may reasonably be required to support the claim within ninety (90) days of receipt of the initial invoice sent by NCI regarding the Disputed Amount. If Customer does not submit a documented claim within ninety (90) days of receipt of the initial invoice sent by NCI regarding such Disputed Amount, notwithstanding anything in this Agreement to the contrary, Customer waives all rights to dispute such Disputed Amount and Customer waives all rights to file a claim thereafter of any kind relating to such Disputed Amount (and Customer also waives all rights to otherwise claim that it does not owe such Disputed Amount or to seek any set-offs or reimbursements or other amounts of any kind based upon or relating to such Disputed Amount).

**4. APPLICABLE TAXES**

Each Party is fully responsible for the payment of any and all taxes required by law to be paid by that Party. Customer will pay all taxes, governmental fees, and third-party charges related to the ownership and operation of Customer's Equipment and the activities of Customer at each Datacenter Facility. Without limiting the foregoing, Customer is responsible for timely paying in full all sales, use, transfer, privilege, excise, and all other taxes and duties, whether international, national, state or local, however designated, now in force or enacted in the future, which are levied or imposed by reason of the performance by NCI or Customer under this Agreement or by Customer with respect to its operations and use of the Datacenter Facility and Customer's Equipment, including any leasehold/license pass thru items, if any ("Taxes"); but the term "Taxes" will exclude income taxes on NCI's profits which may be levied against NCI. The rates and fees on an Order Form (as well as the list prices for the Online/Phone Orders) are exclusive of the Taxes, which Customer will also be responsible for paying at the same time it pays the amounts listed on the Orders. Any applicable Taxes that NCI must collect and remit which must be paid directly to NCI will be stated separately on each invoice. In addition, Customer's Equipment will not be construed to be fixtures, and Customer is responsible for preparing and filing any necessary return with, and paying any and all Taxes separately levied or assessed against Customer's equipment to any governmental, quasi-governmental or tax authorities by the date such payments are due.

**5. TERM OF AGREEMENT AND TERMINATION**

5.1. This Agreement commences on the Effective Date and continues through the latest expiration of all Order Form Term(s) subject to this Agreement, unless earlier terminated as provided herein.

5.2. The Term for each Order Form shall begin on the Commencement Date of the related Product or Service and shall remain in effect until the expiration of the period so specified. Upon the expiration of a Term set forth on an Order Form, such Order Form will renew for successive twelve (12) month terms unless written notice of non-renewal is provided by

*Customer Initials:* JN

### nLayer Communications
### Master Products and Services Agreement

either Party upon at least ninety (90) days prior written notice.

5.3. Notwithstanding anything in this Section 5 to the contrary, each Order Form which contains a one (1) month Term shall renew for consecutive one (1) month Terms, unless written notice of non-renewal is provided by either Party, upon at least thirty (30) days prior written notice.

5.4. NCI may terminate this Agreement as to any affected co-location services if any portion of the Datacenter Facility in which the affected co-location services are located becomes subject to a condemnation proceeding or is condemned, NCI's possession is otherwise terminated or abated, or NCI cannot provide Customer with the access to the affected Datacenter Facility as contemplated herein for a period exceeding thirty (30) days.

**6. DEFAULT**

*Events of Default:* The occurrence of any of the events listed below shall be considered an event of default, which gives the non-defaulting Party the right to terminate the Agreement or affected Order Form(s) by written notice following the expiration of any stated cure periods and pursue its remedies under the Agreement:

- *Customer fails to fully pay any of the payments (including Early Termination Charges) required hereunder within five (5) days after receipt of written notice of such failure;*
- *Except as provided in clause (a), above, the breach of any material term or condition of this Agreement (including Order Forms or Supplements) and such breach remains uncured thirty (30) days after delivery to the breaching Party of written notice of such breach. If the breach is of a nature or involves circumstances reasonably requiring more than thirty (30) days to cure, the time period may be extended provided the breaching Party proceeds diligently to cure the breach;*
- *the application for or consent to the appointment of a receiver, trustee or similar officer for it or any substantial part of its property or assets, or any such appointment is made without such application or consent by such Party and remains undischarged for a period of sixty (60) days;*
- *the filing of a petition in bankruptcy or a general assignment for the benefit of creditors;*
- *Customer defaults under the terms of any other agreement, Supplement or Order Form between the parties whether such other agreement is executed prior or subsequently to the execution of this Agreement.*

If Customer is in default, as set forth above, then, after expiration of the cure period, NCI may, in addition to any other remedies that it may have under this Agreement or by law, disconnect, repossess and/or distrain any Products or Services, or customer equipment located at a Datacenter Facility. If Customer is in default under any obligation of this Agreement or any Sales Order, Customer will be in default of all Sales Orders and this Agreement.

**7. REPRESENTATIONS AND WARRANTIES**

7.1. *Warrants.* NCI warrants that any Products and Services to be provided to Customer will be at a professional level of quality conforming to generally accepted industry standards and in compliance in all material respects with all applicable laws and regulations. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NCI DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY AND ALL OTHER WARRANTIES, EXPRESS OR IMPLIED INCLUDING ANY AND ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.2. Each Party represents and warrants to the other that (i) it is duly organized, validly existing and in good standing under the laws of the state of its organization, (ii) it has all requisite power and authority to enter into and perform its obligations under this Agreement and all Order Forms, (iii) it will comply with all applicable federal, state and local laws, statutes, rules and regulations in connection with the provision and use of the Products and Services and (vi) this Agreement and all Order Forms, when executed, are the legal, valid and binding obligation of such Party.

**8. LIMITATION OF LIABILITY; INDEMNIFICATION**

8.1. THE TOTAL LIABILITY OF EITHER PARTY FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH AN ORDER FORM, EXCLUDING EARLY TERMINATION CHARGES, IS LIMITED TO AN AMOUNT EQUAL ONE POINT FIVE TIMES (1.5X) THE TOTAL CHARGES PAYABLE BY CUSTOMER DURING THE TERM SET FORTH THEREIN. THE TOTAL LIABILITY OF NCI FOR DAMAGES ARISING OUT OF OR IN CONNECTION WITH AN ORDER FORM IS LIMITED TO AN AMOUNT EQUAL TO THE TOTAL CHARGES PAYABLE BY CUSTOMER DURING THE FIRST YEAR OF THE TERM SET FORTH THEREIN. NOTWITHSTANDING ANY PROVISION OF THIS AGREEMENT TO THE CONTRARY, NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS, REVENUE OR LOST BUSINESS OPPORTUNITIES (WHETHER ARISING OUT OF TRANSMISSION INTERRUPTIONS OR PROBLEMS, ANY INTERRUPTION OR DEGRADATION OF SERVICE OR OTHERWISE), WHETHER

Customer Initials: JN

**nLayer Communications**
**Master Products and Services Agreement**

FORESEEABLE OR NOT, EVEN IF A PARTY HAS BEEN ADVISED BY THE OTHER PARTY OF THE POSSIBILITY OF THE DAMAGE AND EVEN IF A PARTY ASSERTS OR ESTABLISHES A FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED IN THIS AGREEMENT. THE LIMITATIONS SET FORTH IN THIS SECTION WILL APPLY TO CLAIMS OF CUSTOMER, WHETHER OCCASIONED BY ANY CONSTRUCTION, INSTALLATIONS, RELOCATIONS, SERVICE, REPAIR OR MAINTENANCE PERFORMED BY, OR FAILED TO BE PERFORMED BY NCI, OR ANY OTHER CAUSE WHATSOEVER, INCLUDING BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, OR STRICT LIABILITY. IN NO EVENT WILL EITHER PARTY BE LIABLE FOR ANY LOSS OF DATA OR TECHNOLOGY.

8.2. NCI agrees to indemnify, defend and hold Customer, its officers, directors, employees, agents and contractors harmless from and against all loss, damage, liability, cost and expense (including reasonable attorney's fees and expenses) by reason of any claims or actions by third parties for (i) bodily injury or death, and damage, loss or destruction of any real or tangible personal property, which third party claims arise out of or relate to NCI's gross negligence or willful misconduct or (ii) infringement or misappropriation by NCI of any intellectual property rights under this Agreement.

8.3. Customer agrees to indemnify, defend and hold NCI, its officers, directors, employees, agents and contractors harmless from and against all loss, damage, liability, cost and expense (including reasonable attorney's fees and expenses) by reason of any claims or actions by third parties, including those of customers of Customer, for (i) bodily injury or death or damage, loss or destruction of any real or personal property (including without limitation the property of NCI), which third party claims arise out of or relate to Customer's gross negligence or willful misconduct, (ii) infringement or misappropriation by Customer of any intellectual property rights under this Agreement, or (iii) Customer's or its customer's use of the Products or Services, including without limitation, defamation, libel, slander, obscenity, pornography, or violation of the rights of privacy or publicity, or spamming or any other tortious or illegal conduct, or (iv) any harm or claims arising out of acts of omission of any customers of Customer or any third parties using Customer's equipment or service that is subject of this Agreement.

8.4. Customer agrees that NCI is not responsible for loss or damage to equipment and property stored or installed in a NCI site. Customer agrees to maintain insurance coverage on equipment and property stored or installed at each NCI site which covers any type of loss and includes a waiver of subrogation clause. NCI shall not be liable for damage to, or loss of any of Customer equipment resulting from any cause, other than NCI's negligence or willful misconduct and then only in an amount not to exceed the replacement value of the damaged equipment, to exceed the limits set forth in Section 8.1.

8.5. Customer shall have no right or interest in any NCI-supplied equipment other than the right to use such equipment during the specified term while payments are current. Customer shall be liable to NCI for any damage to such equipment caused by Customer or Customer's representatives, agents or employees.

**9. CONFIDENTIALITY; PUBLICITY**

9.1. *Confidentiality.* Each Party agrees that the terms of this Agreement and all information furnished to it by the other Party, including maps, pricing, financial terms, network routes, design information, methodologies, specifications, locations or other information to which it has access under this Agreement, are deemed the confidential and proprietary information or trade secrets (collectively referred to as "Proprietary Information") of the Disclosing Party and will remain the sole and exclusive property of the Disclosing Party (the Party furnishing the Proprietary Information referred to as the "Disclosing Party" and the other Party referred to as the "Receiving Party"). Each Party will treat the Proprietary Information that the Receiving Party either knows or reasonably should know to be confidential to the Disclosing Party and the contents of this Agreement in a confidential manner and, except to the extent necessary in connection with the performance of its obligations under this Agreement, neither Party may directly or indirectly disclose the same to anyone other than its employees or third parties identified within an Order hereunder on a need to know basis and who agree to be bound by the terms of this Section, without the written consent of the Disclosing Party. Information will not be deemed Proprietary Information if it (i) becomes publicly available other than through the actions of the Receiving Party; (ii) is independently developed by the Receiving Party; or (iii) becomes available to the Receiving Party without restriction from a third party. If the Receiving Party is required by a governmental or judicial law, order, rule, regulation or permit to disclose Proprietary Information, it must give prompt written notice to the Disclosing Party of the requirements of such disclosure and cooperate fully with the Disclosing Party to minimize such disclosure, and disclosure after such notice shall not be a breach hereof.

9.2. *Publicity.* Notwithstanding anything herein to the contrary, neither party may release a public statement announcing the Agreement ("Press Release") without the prior written consent of the other party.

**10. ASSIGNMENT**

Customer Initials: JN

## nLayer Communications
## Master Products and Services Agreement

Neither party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party, which consent may not be unreasonably withheld, except that either party may assign this Agreement upon notice and without consent to a person, firm, corporation, partnership, association, trust or other entity (i) that controls, is controlled by or is under common control with Customer or (ii) into which it is merged or consolidated or which purchases all or substantially all of its assets; provided that the assignee assumes all liabilities hereunder in writing prior to the effectiveness of such assignment. Any assignment or transfer without the required consent will be void and will be considered a material breach of this Agreement. Upon any permitted assignment, the assigning party will remain jointly and severally responsible for the performance under this Agreement, unless released in writing by the other party, and this Agreement will be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

### 11. FORCE MAJEURE

Neither party will be considered in breach of this Agreement nor liable under this Agreement for any delays, failures to perform, damages or losses, or any consequence thereof, caused by or attributable to an event of "Force Majeure," which is defined as any cause beyond the reasonable control of the party claiming relief, including without limitation the action by a governmental authority (such as a moratorium on any activities related to this Agreement or changes in government codes, ordinances, laws, rules, regulations, or restrictions occurring after the Effective Date), third-party labor dispute, flood, earthquake, fire, lightning, epidemic, war, act of terrorism, riot, civil disturbance, act of God, sabotage, fiber cut caused by a third-party or failure of a third party to recognize a permit, authorization, right-of-way, easement, right, license or other agreement obtained by NCI to construct and operate its facilities or network.

### 12. NOTICES

All notices, including but not limited to, demands, requests and other communications required or permitted hereunder (not including invoices) must be in writing and will be deemed given: (i) when delivered in person, (ii) one (1) business day after deposit with an overnight delivery service for next day delivery, or (iii) three (3) business days after deposit in the United States mail, postage prepaid, registered or certified mail, return receipt requested, and addressed to the recipient Party at the address set forth on the signature page hereof. In addition, NCI shall have the right to send Customer notices, other than notices for default or termination, to Customer's email address as contained on NCI's customer contact list. Such email notification is deemed delivered on the day sent unless returned to sender.

### 13. MISCELLANEOUS

13.1. *Governing Law; Jurisdiction.* This Agreement will be interpreted and construed in accordance with the internal laws of the State of Illinois without giving effect to its principles of conflicts of laws. Any legal proceeding arising out of, or relating to this Agreement, will be brought in a United States District Court, or absent federal court jurisdiction, in a state court of competent jurisdiction.

13.2. *Survival.* The Parties' respective representations, warranties, and covenants, together with obligations of indemnification, confidentiality and limitations on liability will survive the expiration, termination or rescission of this Agreement and continue in full force and effect.

13.3. *No Third-Party Beneficiaries.* The covenants, undertakings, and agreements set forth in this Agreement are solely for the benefit of and enforceable by the Parties or their respective successors or permitted assigns.

13.4. *Relationship of the Parties.* The relationship between the Parties hereunder is not that of partners or agents for one another and nothing contained in this Agreement may be deemed to constitute a partnership, joint venture or agency agreement between them.

13.5. *Remedies Not Exclusive.* Except as otherwise expressly provided, the rights and remedies set forth in this Agreement are in addition to, and cumulative of, all other rights and remedies at law or in equity.

13.6. *Headings; Separability.* The headings in this Agreement are strictly for convenience and do not amplify or limit any of the terms, provisions or conditions hereof. In the event any term of this Agreement is held invalid, illegal or unenforceable, in whole or in part, neither the validity of the remaining part of such term nor the validity of the remaining terms of this Agreement will be in any way affected.

13.7. *No Implied Waiver.* No failure to exercise and no delay in exercising, on the part of either Party, any right, power or privilege hereunder will operate as a waiver, except as expressly provided herein.

13.8. *Counterparts.* This Agreement may be executed in counterparts, including by facsimile transmission, each of which when executed and delivered is an original, but all the counterparts together constitute the same document.

13.9. *Changes Prior to Execution.* Each Party represents and warrants that any changes to this Agreement made by it were properly marked as changes and that it made no changes to the Agreement that were not properly identified as changes.

13.10. *Precedence.* Except as may be set forth herein, this Agreement supersedes all previous and contemporaneous written and oral representations,

Customer Initials: JN

## nLayer Communications
## Master Products and Services Agreement

understandings, or Agreements related to the subject matter herein and shall prevail notwithstanding any variance with terms and conditions of any Order Form submitted, unless otherwise agreed to in writing by both Parties.

### 14. ACCEPTABLE USE

**14.1. Acceptable Use; SPAM.** Customer will at all times comply with and conform its use of the Service to NCI's Acceptable Use Policy and Anti-SPAM Policy set forth at the NCI Website, as updated from time to time, subject to notice to Customer of any material changes. In the event Customer materially violates the NCI Acceptable Use Policy where NCI determines in its reasonable discretion that there is potential harm to its Network or business, NCI shall have the right to immediately suspend Service. In other cases of violation of the Acceptable Use Policy and Anti-SPAM Policy, NCI will provide notice and opportunity to cure, to the extent NCI deems reasonably appropriate, depending on the nature of the violation, the availability of the Customer and whether or not there has been a repeat violation. NCI, in its reasonable discretion, shall re-enable the Service upon satisfaction that all violations have ceased and with adequate assurance that such violations will not occur in the future.

**14.2. Illegal Use.** Customer will cooperate in any investigation of Customer's alleged illegal use of NCI's facilities or other networks accessed through the NCI Network. If Customer fails to cooperate with any such investigation, NCI may suspend Customer's Service. Additionally, NCI may modify or suspend Customer's Service in the event of illegal use of the NCI Network or as necessary to comply with any law or regulation, including the Digital Millennium Copyright Act of 1998, 17 U.S.C. 512, as reasonably determined by NCI.

### 15. RESTRICTIONS

**Government Regulations.** Customer will not export, re-export, transfer, or make available, whether directly or indirectly, any regulated item or information to anyone in connection with this Agreement without first complying with all export control laws and regulations which may be imposed by any government within whose jurisdiction Customer operates or does business.

### 16. EARLY TERMINATION CHARGES

16.1. If an Order Form is terminated prior to expiration by reason of: (i) Customer termination ("Termination for Convenience"), if such termination is not an exercise of Customer's rights or remedies under the Agreement, or (ii) a Customer Event of Default for failure to pay any payment, as provided, herein, then, in addition to all other sums due and owing, Customer agrees to pay an "Early Termination Charge" to NCI.

**16.2. Early Termination Charge.** For service terminated prior to the end of the Term, an early termination charge will be calculated as an amount equal to the aggregate of (i) all remaining Recurring Charges until the end of the Term or (ii) twelve (12) months, whichever is lesser (the "Early Termination Charge").

**16.3. Recurring Charges.** If the Recurring Charges (or a component of the Recurring Charges) are fully prepaid, the Early Termination Charge is equal to the unamortized portion of such prepayment as of the date of termination.

16.4. Customer acknowledges and agrees that the Early Termination Charge reflects a reasonable estimate of the damages incurred by NCI as a result of an early termination, and is not a penalty. Notwithstanding the foregoing, NCI may seek all other available remedies in law and in equity in the case of Customer's default resulting from any reason, other than nonpayment.

Customer Initials: JN

**nLayer Communications**
**Master Products and Services Agreement**

**17. ENTIRE AGREEMENT; AMENDMENT; EXECUTION**

This Agreement, including all Order Forms, Supplements and addenda attached hereto is the entire agreement between the Parties with respect to the subject matter hereof and supersedes any and all prior negotiations, understandings and agreements, whether oral or written. This Agreement may be amended only by a written instrument executed by the Parties. This Agreement may be executed in multiple counterparts, all of which taken together constitute one and the same Instrument. This Agreement may be executed by facsimile. The Parties have executed this Agreement as of the last date of execution below

**NLAYER COMMUNICATIONS, INC.**

Signature: _____
Print Name: Daniel Brok
Title: COO
Date: 10 June 2010

**CUSTOMER**

Signature: _____
Print Name: Josh Will
Title: CEO
Date: 04/13/2010

Address notices for nLayer Communications:

nLayer Communications, Inc.
209 W. Jackson Blvd. Suite 700
Chicago, IL 60606-6936

Address notices for Customer:

561 East Mitchell Hammock Rd
Ste 200
Oviedo, FL 32765
Revelation Networks

Customer Initials: JW



### nLayer Communications, Inc.

### SERVICE SPECIFIC TERMS & CONDITIONS FOR NLAYER IP TRANSIT SERVICE℠

This Amendment sets forth the service terms and conditions specific to the nLayer IP Transit Service℠. Notwithstanding anything in this Amendment to the contrary, this Amendment is governed by, and incorporated by reference in, the Master Service Agreement between Customer and nLayer Communications, Inc.

1. **General.**

    1.1. The nLayer IP Transit Service℠ (the "Service") provides Internet Protocol ("IP") connectivity to the Internet utilizing the nLayer IP network ("IP Network"), at selected Points of Presence ("POP").

    1.2. The Service is available at four (4) Quality of Service ("QoS") levels, namely (i) bronze, (ii) silver, (iii) gold, and (iv) platinum. Customer may select from different QoS levels for each class of Customer's traffic at each port (for example, Internet traffic, voice traffic, and streaming video traffic). Different service level guarantees apply to each QoS level, as set forth below.

    1.3. Any Internet Protocol numbers ("IP Numbers") assigned to Customer by nLayer remain the sole possession of nLayer, and may be used only in connection with and for the duration of the Services purchased. In the event Customer discontinues use of the Services for any reason, or this Agreement terminates for any reason, Customer's right to use the IP Numbers shall terminate within ten (10) business days.

2. **Specific Service Types and Charges.**

    Two monthly recurring billing options are available for the Service: (i) "Full Port", (ii) "Measured". Customer may request a change to the billing options no more than once in each billing Cycle for each port at which the Service is provided. Requests for changes shall not take effect until the start of the next following Billing Cycle.

    2.1. **"Fixed Capacity"** Service is:

    (i) The provision of an Internet access port with fixed capacity at an agreed bandwidth and QoS level, for a fixed monthly recurring port rental charge ("Port Charge") as set out in the Service Order, plus;

    (ii) A committed amount of bandwidth (the "Committed Amount") for a fixed monthly recurring commitment charge ("Commitment Charge") at the per megabit rate as set out in the Service Order (the "Committed Rate").

    2.2. **"Measured Usage"** Service is:

    (i) The provision of an Internet access port with an agreed bandwidth and QoS level, for a fixed monthly recurring Port Change as set out on the Order Form, plus;

    (ii) A committed amount of bandwidth (the "Committed Amount") for a fixed monthly recurring commitment charge ("Commitment Charge") at the per megabit rate as set out in the Service Order (the "Committed Rate"), plus;

    (iii) Usage over and above the committed amount (the "Burst Charge"), measured using the 95th Percentile method as described below, and billed at the per megabit rate as set out in the Service Order (the "Burst Rate").

    95th Percentile is calculated by measuring the average rate of bits per second exchanged during successive five (5) minute intervals in two categories: Incoming and Outgoing. At the end of the month, all data samples in each category are sorted from highest value to lowest, and the top five percent (5%) of samples will be discarded. The highest remaining data sample in the higher of the two categories will then constitute the bandwidth usage of the measured port for that particular month.

Version 1.2  NLAYER CONFIDENTIAL  Page 1/5

A summary of the billing options for the Services is set out below:

| Service Type | Charges |
|---|---|
| Fixed Capacity | (I) Port Charge |
| | (II) Commitment Charge |
| Measured Usage | (I) Port Charge |
| | (II) Commitment Charge |
| | (III) Burst Charge |
| Optional Service Charges | As per Order Form |

## 3. Service Level Agreement.

nLayer is fully committed to providing a reliable, high-quality network to support the IP Transit Service. The IP Transit Service Level Agreement ("IP Transit SLA") defines, through Service Level Guarantees, (i) the parameters for Service Availability, Latency, and Packet Loss, and (ii) the levels of credit which will be granted to Customer on future bills if any of these guarantees are not met.

### 3.1. Service Availability Guarantees.

**3.1.1. Definition.** For the purposes of this guarantee, Service Availability is defined as the ability of the Customer to exchange IP packets with the nLayer IP Network via the IP Transit router ports.

| QoS Level | Availability | Maximum Non-Availability (Approx) |
|---|---|---|
| Platinum | 99.999% | 30 seconds |
| Gold | 99.99% | 4.3 minutes |
| Silver | 99.95% | 21.6 minutes |
| Bronze | 99.9% | 43.2 minutes |

**3.1.2. Credit Calculations.** A credit for three point thirty-three percent (3.33%) of the applicable MRC for the affected port(s) shall be applied for every two (2) hours or any part thereof of non-availability below the availability guarantee.

### 3.2. Latency Guarantees.

**3.2.1. Definition.** For the purposes of this guarantee, "Latency" is defined as the average monthly end-to-end roundtrip delay between the IP Transit POPs on the nLayer IP Network.

**3.2.2. Guarantee.** nLayer commits to an average monthly route-trip for transmissions between points on the nLayer IP Transit Network.

| Service Regions | Average Latency (milliseconds) |
|---|---|
| Trans-Atlantic | ≤ 100 ms |
| European Network | ≤ 50 ms |
| North American Network | ≤ 65 ms |
| Trans-Pacific | ≤ 150 ms |

**3.2.3. Credit Calculations.** If either one or more of the actual region network averages in a given month exceed(s) the targeted metric, nLayer will credit the Customer three point thirty-three percent (3.33%) of the MRC for the affected port(s) if the actual monthly average roundtrip latency on the nLayer Network for one or more of the service parts exceed(s) the Latency parameters set out above in a given month.


### 3.3. Packet Loss Guarantees.

**3.3.1. Definition.** "Packet loss" is defined as the loss of a packet due to transmission errors or router overload while the packet is in transit on the nLayer IP Transit Network.

**3.3.2. Guarantee.** nLayer commits to an average monthly round-trip packet loss for transmissions between any two Customer ports on the nLayer IP Transit Network within the Customer's VPN in accordance with the parameters below.

| QoS Level | Average Packet Loss (per site pair) |
|---|---|
| Platinum | ≤ 0.01% |
| Gold | ≤ 0.05% |
| Silver | ≤ 0.1% |
| Bronze | ≤ 0.5% |

**3.3.3. Credit Calculations.** If the applicable network average for packet loss in a given month exceeds the targeted metric, nLayer will credit the Customer three point thirty-three percent (3.33%) of the MRC for the affected port(s) if the actual monthly average round-trip packet loss on the nLayer IP Transit Network for one or more of the network transmissions exceed(s) the packet loss parameters set out above in a given month.

### 3.4. Service Credit Policies.

**3.4.1.** All credits provided for under these Service Level Agreements are calculated by reference to the MRC of the affected port(s) only. Any other fees, including, but not limited to, Non Recurring Charges ("NRC"), local access circuits, space rental fees, managed services, incremental bandwidth usage, electricity, and hourly support charges, are excluded in the calculation of applicable credits.

**3.4.2.** The percentage of availability and non-availability, for the purposes of Service Level Guarantees, is calculated on the basis of the relevant time stamps in the nLayer trouble ticketing system.

**3.4.3.** In no event shall any credit for any month exceed 100% of the total MRC payable by Customer for the Service in that month.

**3.4.4.** Credits are calculated after deduction of all discounts and other special pricing arrangements, and are not applied to governmental fees, taxes, surcharges, and similar additional charges.

**3.4.5.** These credits are Customer's exclusive remedy with respect to items covered under this Service Level Agreement.

### 3.5. Service Credit Exclusions.
Customers shall not receive any credits under these Service Level Agreements in connection with any failure or deficiency caused by or associated with any of the following:

(i) Circumstances beyond nLayer's reasonable control, defined as Force Majeure in the Master Service Agreement.

(ii) Failure of local access circuits to the nLayer network, unless such failure is caused solely by nLayer.

(iii) False SLA breaches reported as a result of outages or errors of any SLA measurement system.

(iv) Acts or omissions by Customer, Customer's agents, Customer's contractors, or Customer's vendors, including, but not limited to, negligence, willful misconduct, breach of nLayer's Acceptable Use Policy, failure to provide nLayer or its agents adequate access to facilities, or otherwise causing nLayer to be unable to meet any of the criteria set out in this Service Level Agreement.

(v) Scheduled maintenances, emergency maintenances, or necessary network upgrades.

(vi) Disconnection by nLayer for non-payment or other Customer default or breach under the terms of this Agreement.

## 4. Acceptable Use Policies.

Customer shall at all times comply with the nLayer Acceptable Usage Policies ("AUP"), which nLayer may modify from time to time. The current complete policy is available for public review at http://www.nlayer.net/aup/.

Customer shall not use the nLayer Network, Facilities, Equipment, or Services, not permit any persons using Customer's Network, Facilities, Equipment, or Services ("Users"), to engage in any of the following activities ("Prohibited Activities"):

- Engage in any illegal activity, in violation of any applicable laws, regulations, treaties, or tariffs.

- Violate any reasonable Acceptable Use Policies of any provider, host, network operator, or service provider with services or facilities accessed through the nLayer Network.

- Infringe upon the intellectual property rights, including but not limited to copyrights, trademarks, patents, or trade secrets, of nLayer or others.

- Engage in deceptive, fraudulent, or misleading marketing practices or schemes including, without limitation, practices that violate the United States Federal Trade Commission's guidelines.

- Attempt to interfere with, degrade, or deny service to any user or host ("Denial of Service Attacks");

- Introduce malicious programs into a network or server (e.g. viruses, worms, Trojan horses, etc.)

- Send, post, or host harassing, abusive, threatening, or defamatory materials.

- Engage in any activity which violates the privacy of others.

- Breach or attempt to breach the security of any host, network, or account, including but not limited to, accessing data of which Customer is not an intended recipient or logging into a server or account that Customer is not expressly authorized to access.

- Scan or monitor the networks of others without permission or authorization.

- Intentionally omit, delete, forge or misrepresent transmission information, including headers, mail headers, and Internet Protocol addressees.

- Transmit, facilitate the transmission of, or host material or electronic mailboxes advertised via, unsolicited bulk e-mail or Usenet postings.

- Collect email addresses from the Internet for the purpose of sending unsolicited bulk email, or to provide collected addresses to others for that purpose.

- Maintain a mail relay without sufficient access controls to prevent being used to deliver unsolicited bulk e-mail.

- Attempt to circumvent or alter the process or procedures used to measure time, bandwidth utilization, or other methods to document "use" of nLayer products or services.

- Engage in any action that interferes in any way with the operation of the nLayer Network.

- Make or distribute available any software, program, product, or service that is designed to violate this AUP.

- Assist or permit any persons engaging in any of the activities described above.

Customer is responsible for the security of its own networks, equipment, hardware, software, and software applications, as well as enforcing the nLayer AUP with respect to any third parties, including it's customers, accessing the Internet through Customer's use of the nLayer IP Transit Service. Customer shall defend and indemnify nLayer and its Affiliates with respect to claims related to such third party access.

Version 1.2          NLAYER CONFIDENTIAL          Page 4/5

Upon advanced notice to Customer's principal via email or facsimile, and an opportunity to cure of no less than 48 hours, nLayer reserves the right to suspend IP Transit Service based on Customer's unremediated failure to comply with any material requirements of nLayer's then current Policy, which suspension may be immediate and may have a fixed or indefinite duration, but nLayer shall promptly restore service upon the remediation of any breach.

**IN WITNESS WHEREOF**, the Parties have duly executed and delivered this Amendment, as of the Effective Date.

| | |
|---|---|
| Revelation Networks | nLayer Communications, Inc. |
| Company Name | Company Name |
| *[signature]* | *[signature]* |
| Signature | Signature |
| Josh Noll | Daniel Bvork |
| Name (Printed or Typed) | Name (Printed or Typed) |
| CEO | CEO |
| Title | Title |
| 04/13/2010 | 10 June 2010 |
| Date | Date |